WOODWARD & BRO.

*v.*

GUNN.

(*Supreme Court of Appeals of Virginia, April, 1878.*)

. [Virginia Law Journal, 1878, p. 243.]

Promissory Notes—Place for Bank Left Blank—Effect—Case at Bar.*

C. made and signed two notes on printed forms, which were left blank as to the bank at which they were to be payable, and procured G. to sign his name on the back thereof, and these notes he delivered to persons under whom the plaintiffs claimed, as collateral security, under an agreement with such persons that he should deliver to them endorsed notes. It being in proof that C. and G. regarded these notes as negotiable, and that there was a usage in R., where C. and G. lived, to leave notes blank as to the bank at which they were payable, and for the holder to fill such blank, it was *held*: that said notes were to be treated as negotiable, and G., not having been duly notified of their dishonor, was discharged.

The case is stated in the opinion.

*W. W. Gordon* and *B. H. Nash,* for plaintiffs in error.

*Cannon & Courtney,* for defendants in error.

MONCURE, P., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court of the city of Richmond, rendered on the 11th day of Janu-

*See monographic note on "Bills, Notes and Checks," Va. Rep. Anno.

ary, 1873, in an action on the case in assumpsit then pending in said court, in which the plaintiffs in error, Woodward & Bro., were plaintiffs, and the defendant in error, James. Gunn, was defendant.

The action was brought on the first day of October, 1872. The declaration contains four counts.    In the 1st, the plaintiffs aver, that on the 19th day of December, 1868, Ro. J. Christian made his note in writing, commonly called a promissory note, by which he promised to pay to James Gunn the sum of $2,500 in ninety days after date, which said note was then endorsed in blank by said Gunn, and while the same was still in the possession and was the property of said Christian, and the same was by him, said `Christian, thereupon transferred to Courtney, Woodward & Co. for value received, and by them transferred to the plaintiffs for value received ; that on the 7th day of November, 1868, the said Christian made his certain other note in writing, called a. promissory note, by which he promised to pay to said Gunn the sum of $1,000 sixty days after date, which said note was then endorsed in blank by said Gunn, and while the same was still in the possession and was the property of said Christian, and the same was by him, said Christian, thereupon transferred to Courtney, Woodward & Co. for value received, and by them transferred to the plaintiff for value received ; by reason of which promises the defendant became liable to the plaintiffs in the sum of $3,500, the aggregate amount of the two notes aforesaid, and the defendant, in consideration of such indebtedness, afterwards, to wit, on the 1st day of July, 1869, promised to pay to the plaintiffs the said sum of $3,500 whenever he should be thereunto afterwards requested, and plaintiffs say that though the said sum has been long since due and often since demanded, yet the defendant has wholly failed and refused, and still refuses, to pay the same, to the damage of the plaintiffs $5,000 ; and therefore they bring suit.

The second count is like the first, except that it contains an additional averment, "That at the time of the making of the aforesaid two notes, Ro. J. Christian was totally insolvent, and has so continued to be ever since; of all which the defendant had notice."

The third count is like the first, except that it contains an additional averment in regard to the endorsement on each of the said two notes in these words :   "Which said endorsement was intended by the said defendant to give additional credit to the said note when the same should be afterwards transferred by the said Ro. J. Christian."

The fourth count is like the first, except that it contains the additional averments contained in both the second and third counts.

The defendant demurred to the whole declaration and each count thereof, in which demurrers the plaintiffs joined.    He also plead *non assumpsit*, to which plea the plaintiffs replied generally.

On the 11th day of January, 1873, both parties waived their right to a jury, and consented that the whole matter of law and fact arising in the case should be determined, and judgment given by the court.    Whereupon the court, having heard the evidence and arguments and considered the case, overruled the demurrers and rendered judgment for the defendant upon the facts proven and for his costs ; to which judgment of the court on the law and the facts, the plaintiffs excepted, and in the bill of exceptions the evidence in the cause is certified substantially as follows :

"Courtney, Woodward & Co. were tobacco commission merchants, doing business in Philadelphia in 1868, and they made arrangements with R. J. Christian and G. R. Crump, tobacco manufacturers in Richmond, Va., doing business under the style of R. J. Christian, by which they were to

make advances to the latter firm upon promised shipments of tobacco, and at the same time it was agreed that they were to receive, as collateral security, notes endorsed by the defendant, Gunn.    Advances were made from time to time, and various shipments of tobacco were made—C., W. & Co. holding sundry notes of R. J. Christian, similar to those sued on and endorsed by Gunn.    The notes sued on were given to consolidate the smaller notes, similar in all respects, given beforehand—those smaller notes having been renewed at sundry times before, as they matured.    Gunn thought that he was endorsing negotiable paper, as did R. J. Christian, and the notes were executed and endorsed in Richmond, to be sent to Courtney, Woodward & Co. as collateral security as aforesaid.

"On the 3d December the indebtedness of R. J. Christian to Courtney, Woodward & Co. was $6,746.74, and the latter firm at that time had in hand tobacco of R. J. Christian, which was then unsalable, but which was afterwards sold according to account of sales herewith filed, which is in the words and figures following, to wit:" as set forth in the bill of exceptions; the nett amount of sales being $7,934.35.

"On the 1st of January, '69, C., W. & Co. dissolved partnership, and the firm became W., Bro. & Co.    W., Bro. & Co., on the 1st of January, '69, transferred to their books the account of R. J. Christian, and also took a transfer from C., W. & Co. of the notes sued on, and also took charge of the tobacco, all which transfers of the account, the notes and tobacco, were made with the consent of R. J. Christian—the new firm of W., B. & Co. agreeing to continue to make advances to the said Christian.    About the middle of January, 1869, W., Bro. & Co. commenced to make those advances, and continued to make them from that time to the 13th of March, 1869.    They advanced $7,200, and continued to make them until the balance

finally due from R. J. C. to W., B. & Co. amounted to $38,000 at the close of the year 1870. About the middle of January W., Bro. & Co. commenced selling the tobacco before mentioned, which had been on hand January 1st and transferred to W., Bro. & Co. in different parcels, and continued to sell until the 13th March, when the last was disposed of—the nett proceeds of said tobacco, when sold, being nearly $8,000 (per account of sales before spoken of). It was shown in evidence that, by the laws of Pennsylvania, such notes as those sued on are negotiable, without filling up the blank for the particular bank. Neither C., W. & Co. nor W., Bro. & Co. ever had any communication of any sort with Gunn at any time—Gunn never having had any notice of the change in the firm of C., W. & Co., or of the non-payment of the notes by R. J. Christian, nor were those notes ever protested for non-payment, and no demand was ever made on Christian for the payment of the notes. It was further in evidence that it was a frequent custom in Richmond for notes endorsed, for the accommodation of the maker, to be left blank as to the bank where payable, in order that the blank might be filled by the holder. The notes sued on were upon printed forms, and are as follows :

"1.000.              RICHMOND, VA., Nov. 7th, 1868.
Sixty days after date I promise to pay to James Gunn, or order, without offset, one thousand dollars, negotiable and payable at ———, value received.
                              RO. J. CHRISTIAN.
Endorsed, JAMES GUNN.

"2,500.              RICHMOND, VA., Dec. 19th, 1868.
Ninety days after date I promise to pay to James Gunn, or order, without offset, twenty-five hundred dollars, negotiable and payable at the ——— bank, for value received.
                              RO. J. CHRISTIAN.
Endorsed, JAMES GUNN."

The foregoing are all the proceedings in the case in the court below which are material to be stated.

The plaintiff applied to a judge of this court for a writ of error to the judgment aforesaid, which was accordingly awarded.

In the petition to this court for a writ of error, only two errors are assigned in the judgment of the court below, viz.:

1st. "It was held by the court below, that the notes (sued on in this case), being upon printed blanks, with a place for the name of the bank, the holder had a right to insert that name, and not having done so, it should be treated as negotiable paper"—and 2d. "Treating these notes as simple promissory notes, Gunn was liable, both as guarantor and as original security."

It was admitted, and properly so, in the argument of the counsel for the plaintiff in error, that "if the notes were negotiable, then the judgment of the circuit court was right, because they were not protested for non-payment." The liability of an endorser of a negotiable note is entirely conditional; depending upon due proceedings being had in regard to demand of payment of the maker, non-payment by him, protest for non-payment, and notice thereof to the endorser. It is not pretended that anything of this kind occurred in this case.

We will therefore proceed at once to consider the first assignment of error, and under it, whether the notes must not be considered and treated as negotiable notes; at least so far as the liability of the endorser is concerned.

We are decidedly of that opinion; whether they be governed by the law of Virginia, or the law of Pennsylvania.

By the law of Virginia it is declared, that "every promissory note," &c., "for money payable in this state, at a particular bank, or at a particular office thereof for discount

and deposit, or at the place of business of a saving institution or savings bank, or at the place of business of a licensed broker," &c., "shall be deemed negotiable," &c.   Code, ch. 141, section 7, page 987.

Nothing can well be more certain than that the parties to the notes in question, intended them to be negotiable.   They are perfect negotiable notes, under the law of Virginia, as they now stand, with the single exception that the blank left therein for the name of the bank or place at which they were to be made payable, has never been filled; as was evidently contemplated and intended by the parties.   They are dated at "Richmond, Va. ;" one of them "Nov. 7th, 1868," and the other "Dec. 19th, 1868 ;" payable, one of them, "sixty," and the other "ninety days after date."   They are payable "to James Gunn, or order, without offset," and are "negotiable and payable," one of them "at ———, value received," and the other and large one "at the ——— bank, value received."

Now, all these expressions are common, and some of them peculiar, to negotiable notes in Virginia.   The name of the bank or place of payment was, no doubt, left blank because it was not known where it might be most convenient to negotiate them, whether in Virginia or Pennsylvania, or at what bank or other place it might best suit the holder to have them payable, and it was immaterial to the endorser, if not to the maker also, where they might be payable.   That both of the parties to the notes, maker and payer and endorser, intended and considered them to be negotiable notes, is certified as a fact in the cause.   It is stated in the certificate of facts, that "Gunn thought he was endorsing negotiable paper, as did R. J. Christian."   That the parties who made the advancements also considered them to be negotiable notes, is certified as a fact in the cause.   It is stated in the certificate of facts, that "Gunn thought he was

endorsing negotiable paper, as did R. J. Christian." That the parties who made the advancements, also considered them to be negotiable notes, is shown by the fact which is certified, that at the time of the making the arrangements for advances by C., W. & Co., "it was agreed that they were to receive as collateral security, notes endorsed by the defendant, Gunn." That all the parties concerned considered them as negotiable notes, is further shown by the previous dealings between them on the subject. They commenced dealing with each other in the year 1868, and yet in that year, before the date of these notes, there had been other similar notes for small amounts executed by the same maker and endorser, from time to time, for the same purpose. These were, no doubt, negotiable notes, and the notes in question, which were executed for their renewal, and by way of consolidation, were, no doubt, intended to be of the same character, as seems to be conclusively shown by the form and expressions of the notes in question.

The motive which the endorser had for becoming liable only as endorser, is obvious. In that way, it would have to be determined in a very short time, that is, in 60 or 90 days from the dates of the notes, whether the endorser would be liable at all ; for unless they were protested for non-payment, and notice of dishonor was given to the endorser in due time, he would not be liable. If he was to be liable, not as endorser, but as surety or guarantor, it might not be ascertained for a long time whether he would have to pay any thing, and what amount, or account of such liability. If that had been the intention of the parties, they would have adopted a different form of contract from a negotiable note at 60 or 90 days. They would merely have bound themselves to the extent of $3,500 for the indemnity of the parties by whom the advancements were made.

It is evident that those parties did not consider Gunn to

be liable otherwise than as an endorser of a negotiable note, on which he ceased to be liable by the failure of the holders to have it protested for non-payment, and notice of dishonor given to him according to law.   Is it credible, if they had considered him otherwise liable, they would never have made any demand of him or given him the least intimation that they considered him liable, on account of the notes, from the time of their date in 1868, until the institution of this action in October, 1872?   Is it credible that they would have gone on to make advances to the extent of $38,000, depending in the least degree on such a doubtful security as could have been afforded by the notes in question for $3,500?

If it was intended that these notes should be negotiable, and that the holders might fill the blank left for the name of the bank or other place of payment, as was certainly the case, was it not lawful for them to do so? and will not the notes be considered as negotiable, notwithstanding the blanks therein were never in fact filled?   We think there can be no doubt about these questions, and that they must be answered in the affirmative.

Certainly it is competent to give authority, even by parol, to fill a blank in a note after it has been made and endorsed, and certainly such authority was given in this case, as has been fully shown.

It is admitted by the counsel for the plaintiff in error, that a blank may sometimes be filled in a note after it has been made and endorsed.   But it is argued that a blank cannot be so filled when the note is in the form of a valid security without the blank being filled.   That it is in such form, may afford some evidence that no power was given to fill the blank.   But when it is otherwise clear, as it is in this case, that such a power was given, it is a valid power, notwithstanding the note is in such form as aforesaid, without the blank being filled.

In addition to the general doctrine of the law on this subject, it appears from the certificate of facts in this case, that "it was further in evidence that it was a frequent custom in Richmond for notes, endorsed for the accommodation of the maker, to be left blank as to the bank where payable, in order that the blank might be filled by the holder." The blanks were left in these notes, as well they might be, in conformity with that custom.

We have regarded these notes, thus far, as Virginia contracts; but they may be regarded, with the same effect, as Pennsylvania contracts; which perhaps they are—though they were probably made in reference to either state, and the blanks in them might have been filled up with the name of a place in Virginia or Pennsylvania, as might have been convenient to the holder. "These notes would have been negotiable according to the law of Pennsylvania, whether payable at a bank or not," as though no place for payment were named in the notes. "It was shown in evidence," as stated in the certificate of facts, "that by the laws of Pennsylvania, such notes as those sued on are negotiable without filling up the blank for the particular bank."

We are, therefore, of opinion that whether this case be governed by the law of Virginia or the law of Pennsylvania, by one or the other of which it must, of necessity, be governed, the notes aforesaid, were negotiable ; and it is admitted by the counsel of the plaintiff in error, as we have seen, that in that case the judgment of the circuit court was right. We need not, therefore, discuss or consider the second assignment of error in the case ; that is, treating these notes as simple promissory notes, Gunn was liable, both as guarantor and as original security." We do not by any means admit, however, that he would be liable in either character, even on that hypothesis.

There are other questions arising on this record which are

not necessary to be considered, and we mention them now only to show that we do not mean to intimate any opinion upon them.

We believe that none of the many cases cited by the counsel in their argument of this case are in conflict with the foregoing opinion, while some, if not most of them, confirm and sustain it.

We therefore think the judgment ought to be affirmed.

Judgment affirmed.

---

### NOTE.

The opinion of the court in this case deserves more than a passing notice. The notes in controversy are upon their face unmistakably non-negotiable, but the court held that inasmuch as the parties intended to execute negotiable paper and thought the notes were negotiable, that they should be so treated although they lacked the sole ingredient which is necessary under our statutes to make them so, viz. : being payable at a particular bank. It is difficult to see upon what principle a paper complete and unambiguous upon its face shall be interpreted and its character determined, not by its terms, but by parol proof of what the parties intended it to be. Nothing is better settled than that a blank cannot be filled in any paper which is a complete legal instrument, if such filling changes the character and effect of the paper. The court here, while admitting this principle, say that it is subject to the qualification, that even such a blank may be filled if authorized by the parties, and that such authority was clearly proved in this case, *i. e.*, by proving that the parties intended to execute and thought they had executed negotiable paper. This is a strange confusion of ideas. So far from an authority to fill the blanks being proven, by proving that the parties thought they were executing negotiable paper, exactly the contrary is shown. If they thought the paper already negotiable which they had executed, no possible authority could be presumed to enable that to be done, which was necessary to make it negotiable. The parties simply made a mistake as to what they considered the legal effect of the notes. But even if the intention of the maker and endorser to execute paper of a different character from that actually made could operate as authority to the holder to make the change, surely such intention on their part could not bind the holder unless he were informed of it. The

only circumstance apparently relied on here to show this knowledge is the fact that the holder making the advances contracted that he was to receive as collaterals paper endorsed by Gunn. But if the holder, by this term endorsement, is held to understand that the notes were to be negotiable, then when non-negotiable notes were given him he might have had a right to refuse to receive them under his agreement; but that agreement certainly gave him no authority to change the notes which had been furnished him in their most essential feature and change them from non-negotiable to negotiable, because he had only agreed to receive the latter kind. But in fact, lawyers, text-writers, the supreme court of this state and the supreme court of the United States use the term "endorser" as applicable to one who writes his name on the back of a note, whether negotiable or non-negotiable, and it is at least singular that a tobacco merchant should be held by this word to mean a technical endorser on negotiable paper. The holder, by not protesting the notes at maturity, has given the very best evidence that he did not consider or treat them as negotiable. Not having brought suit on them for several years, might well be evidence of want of diligence so as to discharge the guarantor, but it is difficult to see how this failure to demand payment can have any bearing on the question whether he considered the notes negotiable or not. Under this decision, it would be nearly impossible to give the holder of such paper in Virginia any intelligent advice as to its character or the proceedings for its collection. To determine either, it would first be necessary to go into an inquiry as to the intention of the maker, the endorser and the holder at the time the notes were executed, if this case is law.